**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**FILED**

DEC 2 1 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

| | |
|---|---|
| **WISCONSIN RIGHT** ) | |
| **TO LIFE, INC.,** ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civ. No. 04-1260 (DBS, RWR, RJL)** |
| ) | |
| **FEDERAL ELECTION** ) | **THREE-JUDGE COURT** |
| **COMMISSION,** ) | |
| **Defendant,** ) | |
| ) | |
| ***and*** ) | |
| ) | |
| **SEN. JOHN McCAIN** *et al.,* ) | |
| **Intervening Defendants** ) | |

Before: SENTELLE, Circuit Judge; ROBERTS, District Judge; and LEON, District Judge.

Opinion for the Court filed by District Judge Leon, in which Circuit Judge Sentelle joins in full. Dissenting opinion filed by District Judge Roberts.

Leon, District Judge:

Plaintiff, Wisconsin Right to Life, Inc. ("WRTL" or "the Corporation"), brings this

action against defendant, the Federal Election Commission ("FEC"), seeking a judgment

declaring section 203 of the Bipartisan Campaign Reform Act of 2002 ("BCRA"), Pub. L.

No. 107-155, 116 Stat. 81,[1] unconstitutional as it applies to three broadcast advertisements

WRTL intended to run within thirty days of Wisconsin's 2004 federal primary and sixty days

of the 2004 federal general election, as well as "materially similar ads" it "intends to run" in

the future. (Am. Compl. ¶¶ 1, 13, 15, 16.)

Under BCRA's prohibition on "electioneering communications," WRTL could not

---

[1]      Codified at 2 U.S.C. § 441b(a), (b)(2).



lawfully run the three advertisements during the 30- and 60-day periods before the 2004 primary and general elections. Thus, WRTL claims that the enforcement of BCRA with regard to these advertisements would violate the First Amendment, which provides: "Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people . . . to petition the Government for a redress of grievances." U.S. Const. Amend. I.

Now before the Court are cross-motions for summary judgment filed on behalf of (1) WRTL, (2) the FEC, and (3) intervening defendants, United States Senator John McCain and Representatives Tammy Baldwin, Martin Meehan, and Christopher Shays (collectively, "Interveners"). Upon due consideration of the parties' submissions, the relevant case law, and the entire record herein, WRTL's Motion for Summary Judgment is GRANTED as to the three ads WRTL intended to run in 2004, and the FEC and Interveners' Motions are DENIED.

## BACKGROUND

WRTL is a nonprofit, nonstock, Wisconsin, ideological advocacy corporation recognized by the Internal Revenue Service as tax-exempt under § 501(c)(4) of the Internal Revenue Code.[2] (Mem. & Op., Findings of Fact ¶ 1, Sept. 14, 2006.) On July 26, 2004,

---

[2]      WRTL admits that it does not qualify for any exception permitting it to pay for the exception electioneering communications from corporate funds because (a) it is not a "qualified nonprofit corporation" within the definition of 11 C.F.R. § 114.10 so as to qualify for the exception found at 11 C.F.R. § 114.2(b)(2) to the electioneering communication prohibition and (b) its advertisements are "targeted" so that it does not fit the exception for § 501(c)(4) organizations as described in 2 U.S.C. § 441b(c)(2). (Am. Compl. ¶ 23 (citing 2 U.S.C. § 441b(c)(6)(A)).)

WRTL began broadcasting a radio advertisement entitled "Wedding"[3] (Compl. Ex. A), which "encourage[d] Wisconsin listeners to contact their U.S. Senators (Sen. Russell Feingold and Sen. Herb Kohl) . . . to ask them to vote against [the then-]anticipated filibusters of President Bush's federal judicial nominees" (Am. Compl. ¶ 6). At the same time, the Corporation initiated the production of a second radio ad entitled "Loan"[4] (Compl. Ex. B) and one

_____

[3]       The radio script for "Wedding," attached as Exhibit A to plaintiff's Complaint, reads as follows:

PASTOR:  And who gives this woman to be married to this man?

BRIDE'S FATHER:  Well, as father of the bride, I certainly could.  But instead, I'd like to share a few tips on how to properly install drywall.  Now you put the drywall up . . .

VOICE-OVER: Sometimes it's just not fair to delay an important decision.

But in Washington it's happening.  A group of Senators is using the filibuster delay tactic to block federal judicial nominees from a simple "yes" or "no" vote.  So qualified candidates don't get a chance to serve.

It's politics at work, causing gridlock and backing up some of our courts to a state of emergency.

Contact Senators Feingold and Kohl and tell them to oppose the filibuster.
Visit: BeFair.org

Paid for by Wisconsin Right to Life (befair.org), which is responsible for the content of this advertising and not authorized by any candidate or candidate's committee.

[4]       The radio script for "Loan," attached as Exhibit B to plaintiff's Complaint, reads as follows:

LOAN OFFICER:  Welcome Mr. and Mrs. Shulman.  We've reviewed your loan application, along with your credit report, the appraisal on the house, the inspections, and well . . .

COUPLE:  Yes, yes . . . we're listening.

OFFICER:  Well, it all reminds me of a time I went fishing with my father.  We were on the Wolf River Waupaca . . .

VOICE-OVER: Sometimes it's just not fair to delay an important decision.

But in Washington it's happening.  A group of Senators is using the filibuster delay tactic to block federal judicial nominees from a simple "yes" or "no" vote.  So qualified candidates aren't getting a chance to serve.

It's politics at work, causing gridlock and backing up some of our courts to a state of emergency.

(continued...)

television ad entitled "Waiting"[5] (*id.* Ex. C). (Am. Compl. ¶ 12.) Like Wedding, Loan and

Waiting encourage their listeners to contact Senators Feingold and Kohl and urge them to

oppose the filibustering of federal judicial nominees.   None of the three advertisements,

however, reference either Senator's past votes on the filibuster issue and none contain any

language that could be fairly construed as promoting, attacking, supporting, or opposing

("PASO") either Senator.  Yet because WRTL intended to use its general treasury funds to

---

[4](...continued)
        Contact Senators Feingold and Kohl and tell them to oppose the filibuster.
        Visit: BeFair.org
        Paid for by Wisconsin Right to Life (befair.org), which is responsible for the
content of this advertising and not authorized by any candidate or candidate's
committee.

[5]      The television script for "Waiting," attached as Exhibit C to plaintiff's Complaint,
reads as follows:
        VOICE-OVER:  There are a lot of judicial nominees out there who can't go
to work.   Their careers are put on hold because a group of Senators is
filibustering—blocking qualified nominees from a simple "yes" or "no" vote.
        It's politics at work and it's causing gridlock.
        Contact Senators Feingold and Kohl and tell them to oppose the filibuster.
        Visit: BeFair.org
        WRTL REPRESENTATIVE VOICE-OVER:  Wisconsin Right to Life is
responsible for the content of this advertising.
The script describes the visual aspect of the advertisement is described as follows:
        We see vignettes of a middle-aged man being as productive as possible while
his professional life is in limbo:
        He reads the morning paper
        He polishes his shoes
        He checks for mail, which hasn't arrived
        He scans through his Rolodex
        He reads his Palm Pilot manual
        He pays bills.
At the end of the ad, the website "www.BeFair.org" is displayed, and a four-second disclaimer reads:
"Paid for by Wisconsin Right to Life (befair.org), which is responsible for the content of this
advertisement, not authorized by any candidate or candidate's committee."

continue to run its ads through "the adjournment of Congress"[6] (*id.* ¶ 13), the ads would be

prohibited as "electioneering communications" by BCRA section 203[7] between the dates of

August 15 and November 2, 2004[8] (*id.* ¶ 14). Accordingly, on July 28, 2004, WRTL filed

a complaint in this Court against the FEC,[9] challenging the constitutionality of section 203

as it applies to the Corporation's anti-filibuster ads and seeking "declaratory and injunctive

---

[6]     Elsewhere in WRTL's Complaint, the Corporation alleges that intended to run its ads "throughout August [2004]." (Am. Compl. ¶ 12.)

[7]     BCRA section 203 prohibits corporations from financing "electioneering communications" through their general treasuries. *See* 2 U.S.C. § 441b(a), (b)(2). BCRA section 201, in turn, defines "electioneering communications" as:
   any broadcast, cable, or satellite communication which–
   (I) refers to a clearly identified candidate for Federal office;
   (II) is made within–
         (aa) 60 days before a general, special, or runoff election for the office sought by the candidate; or
         (bb) 30 days before the primary or preference election, or a convention or caucus of a political party that has authority to nominate a candidate, for the office sought by the candidate; and
         (cc) in the case of a communication which refers to a candidate for an office other than President or Vice President, is targeted to the relevant electorate.
2 U.S.C. § 434(f)(3)(A).
   According to the Act, "a communication which refers to a clearly identified candidate for Federal office is 'targeted to the relevant electorate' if the communication can be received by 50,000 or more persons– (i) in the district the candidate seeks to represent, in the case of a candidate for Representative in, or Delegate or Resident Commissioner to, the Congress; or (ii) in the State the candidate seeks to represent, in the case of a candidate for Senator." 2 U.S.C. § 434(f)(3)(C).

[8]     In 2004, the Wisconsin primary was held on September 14, and the general election was held on November 2. (Am. Compl. ¶ 12.) Consequently, WRTL's advertisements would be considered "electioneering communications" from August 15 to September 14 (30 days before the primary) and from September 3 to November 2 (60 days before the general election). (*Id.* at 14.)

[9]     The FEC is the government agency charged with enforcing the relevant provisions of the Federal Election Campaign Act, as amended by the BCRA. (Mem. & Op., Findings of Fact ¶ 2, Sept. 14, 2006).

relief permitting [the Corporation] to run [its ads] and materially similar ads in the future."[10]

(Am. Compl. ¶ 15.)   That same day, WRTL filed a Motion for Preliminary Injunction,

requesting that the Court "preliminarily enjoin the FEC from enforcing the prohibition on

corporate expenditures for electioneering communications at Section 203 of the [BCRA], as

applied to (a) electioneering communications by WRTL that constitute grass-roots lobbying

and (b) the electioneering communications by WRTL contained in [the Wedding, Loan, and

Waiting advertisements] until a final hearing on the merits." (Pl.'s Mot. Prelim. Inj. at 2.)

On July 29, 2004, WRTL's application for a three-judge district court was granted pursuant

to 28 U.S.C. § 2284 and section 403 of the BCRA (Order, July 29, 2004); this Court was

empaneled four days later (Order, Aug. 9, 2004).

On August 12, 2004, this Court held oral argument on plaintiff's Motion for

Preliminary Injunction, which it denied via Minute Order later that day. In denying WRTL's

Motion, we relied on the Supreme Court's opinion in *McConnell v. Federal Election*

*Commission*, 540 U.S. 93 (2003).   Recognizing that the *McConnell* Court was only

considering a facial challenge to BCRA, this Court nevertheless concluded that "the

reasoning of the *McConnell* Court leaves no room for the kind of 'as applied' challenge

WRTL propounds before us."[11]   (Mem. & Op. at 4, Aug. 17, 2004.)   On May 10, 2005,

---

[10]      WRTL did not and does not challenge the reporting and disclaimer requirements for
electioneering communications, only the prohibition on using its corporate funds to finance the
challenged advertisements. (Am. Compl. ¶¶ 34-37.)

[11]      The Court pointed specifically to the Supreme Court's discussion of the BCRA's
"backup" definition of "electioneering communications," 2 U.S.C. § 434(f)(3)(A)(ii), which would

(continued...)

following supplemental briefing by the parties, we dismissed plaintiff's Complaint in its entirety. Again, this Court concluded that "WRTL's 'as-applied' challenge to BCRA is foreclosed by the Supreme Court's decision in *McConnell*." (Mem. & Op. at 2, May 10, 2005.) Within two days of this Court's Order, plaintiff filed a Notice of Appeal to the United States Supreme Court pursuant to 28 U.S.C. § 1253 and BCRA section 403(a)(3). (Notice of Appeal, May 12, 2005). The Supreme Court noted probable jurisdiction on September 27, 2005. *WRTL v. FEC*, 126 S. Ct. 36 (2005).

On January 23, 2006, the Supreme Court vacated this Court's May 10, 2005 dismissal, explaining that "[i]n upholding § 203 [of BCRA] against a facial challenge, we did not purport to resolve future as-applied challenges." *WRTL v. FEC*, 126 S. Ct. 1016, 1018 (2006). The case was thus remanded to this Court with instructions to "consider the merits of WRTL's as-applied challenge in the first instance." *Id.*

On March 23, 2006, this Court granted a Motion to Intervene as Defendants brought by United States Senator John McCain and Representatives Tammy Baldwin, Christopher Shays, and Martin Meehan pursuant to BCRA section 403(b). We then issued a Scheduling

---

[11](...continued) take effect only if the primary definition—cited above—were held to be "constitutionally insufficient." The Supreme Court declined review of the backup definition, stating: "[W]e uphold *all application* of the primary definition and accordingly have no occasion to discuss the backup definition." *McConnell*, 540 U.S. at 190 n.73 (emphasis added).

On August 13, 2006, plaintiff filed a Motion for Injunction Pending Appeal. This Court's denial of that Motion was upheld by the Supreme Court on September 14, 2004. *WRTL v. FEC*, 542 U.S. 1305 (2004) (Rehnquist, Circuit Justice).

Order on April 17, 2006, which allowed for an expedited period of discovery.[12]  From June

23 to September 11, 2006, the parties submitted their respective Motions for Summary

Judgment, response briefs, and proposed findings of fact.[13]  On September 18, 2006, the

Court held oral argument on the parties' Motions.

**STANDARD OF REVIEW**

All parties move for summary judgment pursuant to Federal Rule of Civil Procedure

56, which states that summary judgment "shall be rendered forthwith if the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits,

if any, show that there is no genuine issue as to any material fact and that the moving party

is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp.*

*v. Catrett*, 477 U.S. 317, 322-24 (1986).  In deciding whether there is a disputed issue of

material fact, the Court must draw all justifiable inferences in favor of the non-moving party.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  Where the court finds that facts

material to the outcome of the case are at issue, a case may not be disposed of by summary

---

[12]     Our colleague, in his dissenting opinion, suggests that our earlier unanimous decision
to allow discovery in this case is somehow inconsistent with our decision today to limit our
constitutional evaluation of the ads to their four corners, as opposed to the context in which they
would have been aired.  We disagree.  At the time our discovery decision was made, we had not yet
focused on, let alone decided, the ultimate substantive issues we would have to resolve in order to
decide this case.  Simply stated, permitting discovery by the parties was necessary to ensure that both
this Court and the Supreme Court would have the option of relying upon the facts developed, if
doing so would be necessary to reaching the ultimate constitutional issues in this case.

[13]     Briefing was originally scheduled to be completed by September 1, 2006; however,
in the course of discovery, the FEC filed a Motion to Compel that was not ruled on until August 18,
2006.  The Court permitted the parties to supplement their Summary Judgment briefing in response
to the discovery permitted by the Court in response to the FEC's Motion.

8

judgment. *Id.* at 248. If the facts in dispute are "merely colorable, or . . . not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted). Though the moving party bears the burden of establishing that there are no genuine issues of material fact and that judgment on the legal issues is appropriate in its favor, *Celotex*, 477 U.S. at 322-24, a party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial," Fed. R. Civ. P. 56(e). If there is insufficient evidence indicating that the fact-finder could return a favorable verdict for the nonmoving party, then summary judgment is proper. *Anderson*, 477 U.S. at 252.

## JURISDICTION

Jurisdiction for constitutional challenges to BCRA was squarely vested in this Court by Congress. Defendants, however, as an initial matter, oppose WRTL's constitutional challenge to the 2004 anti-filibuster ads as moot and WRTL's challenge to certain hypothetical "materially similar" ads that it wishes to run in the future as not ripe. For the following reasons, we disagree with defendants' mootness argument, but agree with their ripeness position.

### I. *Mootness*

WRTL chose to forgo running its ads in 2004 rather than take the risk that enforcement proceedings would be brought against it. (Am. Compl. ¶ 52; Pl.'s Proposed Findings of Fact ¶ 42.) As a result, defendants' mootness argument boils down to its

contention that Article III's "case or controversy" requirement is not satisfied because "[e]vents have so transpired that the decision [of this Court] will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future." (Def.'s Mem. Addressing Apr. 17, 2006 Scheduling Order, at 3 (internal quotation marks omitted) (quoting *Pharmachemie B.V. v. Barr Labs., Inc.*, 276 F.3d 627, 631 (D.C. Cir. 2002)).) We disagree.

Plaintiff's factual predicament is not novel. Indeed, it is a classic example of the well-established exception to the mootness doctrine for cases that are "capable of repetition, yet evading review." Plaintiff's citation to no less than ten federal court decisions involving election-related challenges in which this exception was applied well establishes this point. (*See* Pl.'s Mem. Compliance Apr. 17, 2006 Scheduling Order, at 4-5 n.3 (citing *Norman v. Reed*, 502 U.S. 279, 287-88 (1992); *Meyer v. Grant*, 486 U.S. 414, 417 n.2 (1988); *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 774 (1978); *Cal. Pro-Life Council v. Getman*, 328 F.3d 1088, 1095 n.4 (9th Cir. 2003); *Majors v. Abell*, 317 F.3d 719, 722 (7th Cir. 2003); *Fla. Right to Life, Inc. v. Lamar*, 273 F.3d 1318, 1324 n.6 (11th Cir. 2001); *Va. Soc'y for Human Life, Inc. v. FEC*, 263 F.3d 379, 390 n.3 (4th Cir. 2001); *Stewart v. Taylor*, 104 F.3d 965, 969-71 (7th Cir. 1997); *N.H. Right to Life Political Action Committee v. Gardner*, 99 F.3d 8, 18 (1st Cir. 1996); *Kansans for Life, Inc. v. Gaede*, 38 F. Supp. 2d 928, 932 (D. Kan. 1999).)

Defendants grudgingly characterize the application of this exception as a "close

question" notwithstanding our Circuit Court's holding in *Branch v. FCC*, 824 F.2d 37, 41 n.2

(D.C. Cir. 1987), that "[c]ontroversies that arise in election campaigns are unquestionably

among those saved from mootness under the exception for matters 'capable of repetition, yet

evading review.'" (Intervening Def.s' Resp. Scheduling Order, at 4). The thesis underlying

their objection is that plaintiff cannot satisfy the two-prong test established by the Supreme

*Court* to determine whether this exception should apply.  How so?

In *First National Bank of Boston v. Bellotti*, the Supreme Court, citing its decision in

*Weinstein v. Bradford*, held that a court can exercise jurisdiction over a plaintiff's claims if:

"(1) the challenged action was in its duration too short to be fully litigated prior to its

cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining

party [will] be subjected to the same action again." 435 U.S. at 774 (internal quotation marks

omitted; alterations in original) (quoting *Weinstein v. Bradford*, 423 U.S. 147, 149 (1975)).

Plaintiff easily satisfies both prongs of this test.

As to the first prong, it is entirely unreasonable, if not fanciful, to expect that plaintiff

could have obtained complete judicial review of its claims in time for it to air its ads during

the 30 and 60-day periods leading up to federal primary and general elections ("BCRA

blackout period") in 2004. WRTL filed its Complaint and Motion for Preliminary Injunction

in this Court on July 28, 2004. The Supreme Court issued its remand order on January 23,

2006.  It is now December 2006, and despite the fact that both courts have—pursuant to

BCRA section 403(a)(4)—expedited the disposition of this matter "to the greatest possible

11

extent," plaintiff's claims have yet to be "fully litigated." Defendants' argument that "the two-year election cycle should ordinarily provide sufficient time for final resolution of the type of as-applied challenge at issue here" (Intervening Def.s' Resp. Scheduling Order, at 4-5) is wholly unrealistic. It assumes—without support—that a plaintiff can know the pieces of legislation that will be pending before Congress *two years* in advance of Congress actually considering the legislation. This Court finds no evidence in the record to suggest that WRTL knew, in the summer/fall of 2002, that judicial filibustering would be an issue before the United States Senate during the BCRA blackout period in 2004. Indeed, there is no evidence in the record to suggest that the *Senate* knew, in the summer/fall of 2002, that judicial filibustering would be an issue during the BCRA blackout period in 2004. In fact, it was not until December 10, 2003—the date that the Supreme Court issued its opinion in *McConnell*—that *anyone* knew if there would even be a BCRA blackout period in 2004. Thus, WRTL easily satisfies the first prong of the *Weinstein* test.

As to the second prong, the Court finds that there is a highly "reasonable expectation" that plaintiff "will be subject to the same action again." Defendants' contrary argument that the present controversy is *incapable* of repetition is premised on its contention—that we reject—that the context surrounding the creation and dissemination of the ads (including plaintiff's intent, the availability and adequacy of non-broadcast media, the perceptions of the target audience, and the circumstances of the 2004 campaign) should be relied upon in assessing this decision. (*See id.* at 5.) To the contrary, because we believe that our review

12

should be limited to the text and images of the ads themselves—as will be explained more fully later—we are not concerned with the supposed "perfect storm" of contextual characteristics alleged by defendants.[14]   While WRTL's intention to run genuine issue advertisements during future BCRA blackout periods is not enough to sustain its generalized claim regarding "grassroots lobbying advertisements," it is enough to create a "reasonable expectation" that it "will be subject to the same action again."[15]   In light of the fact that legislation typically arises in the 30- and 60-day periods before a federal primary or general election, *see McConnell v. FEC,* 251 F. Supp. 2d 176, 793 (D.D.C. 2003) (Leon, J.), this Court finds that WRTL's remaining claim is "capable of repetition, yet evading review."

## II. *Ripeness*

WRTL's as-applied challenge features a prophylactic challenge to what it anticipates to be the prohibition by the FEC of its broadcasting "materially similar" ads in future election contests.  WRTL appears to add this prayer for relief as part of its larger objective: to get this Court—and ultimately the Supreme Court—to carve out an exception to BCRA's electioneering communications definition for what it refers to as "grass-roots lobbying"

---

[14]     To the extent the District Court in *Christian Civil League of Maine, Inc. ("CCLM") v. FEC,* No. 06cv0614, 2006 WL 2792683 (D.D.C. Sept. 27, 2006)—confronted with essentially the same issue—held that "the League's claims are . . . moot and not saved by the 'capable of repetition, yet evading review' exception to the doctrine insofar as they do pertain to the circumstances surrounding the League's efforts to broadcast the Crossroads advertisement," *CCLM,* 2006 WL 2792683, at *1, we respectfully disagree.

[15]     In fact, WRTL attempted to run a different ad during the BCRA blackout period in 2006.  While the ad was not the textual equivalent of the ads in this case—and while this Court does not speak to merits of WRTL's claim as to that ad—the attempt nevertheless lends credence to WRTL's contention that there is a "reasonable expectation" that it "will be subject to the same action again."

advertisements. (Am. Compl. ¶ 6.) Indeed, WRTL admits that "this Court is not *required* by the [Supreme Court's] remand to go beyond WRTL's specific ads," but nevertheless asks the Court to fashion a "more general rule to guide the regulated public." (Pl.'s Mem. Compliance Apr. 17, 2006 Scheduling Order at 7.) Defendants, not surprisingly, contend that this Court should not consider WRTL's generalized grassroots lobbying claim as it is "beyond the scope of the Supreme Court's remand, . . . not ripe, and . . . too speculative and hypothetical to be justiciable under Article III." (Def.'s Mem. Addressing Apr. 17, 2006 Scheduling Order, at 8.) We agree.

WRTL alleges, at most, that it "intends to run materially similar grass-roots lobbying ads falling within the electioneering communication prohibition periods before future primary and general elections in Wisconsin." (Am. Compl. ¶ 16.) Simply stated, such an intention is too speculative and thus not sufficiently concrete to state a cognizable claim under Article III. Like another three-judge panel of this District Court that recently reached the same conclusion in a similar case, *see CCLM*, 2006 WL 2792683, at *2-5, we also cannot expand our authority beyond the contours of Article III. Accordingly, we reject WRTL's generalized lobbying claim as unripe and turn to plaintiff's arguments challenging the constitutionality of BCRA as it applies to the three anti-filibuster ads.

## ANALYSIS

Reduced to its essence, plaintiff's as-applied challenge boils down to two arguments: (1) that its 2004 ads are neither express advocacy nor its functional equivalent; and (2) that

14

the Government has failed to demonstrate a compelling interest in regulating these ads. For the following reasons, we agree with each of plaintiff's contentions.

I. *Express Advocacy and Its Functional Equivalent Versus Genuine Issue Advertising*

In *McConnell*, 540 U.S. 93, the Supreme Court evaluated a facial challenge to the constitutionality of BCRA's electioneering communications provision. In doing so, its majority concluded that there was a compelling government interest in regulating express advocacy and its functional equivalent (i.e., "sham issue ads") during the BCRA blackout period. Based on our interpretation of that ruling, this three-judge Court in 2004 dismissed this as-applied challenge to the constitutionality of the FEC's prohibition of the ads designed to be aired on television in Wisconsin during the BCRA blackout period leading up to the 2004 primary and general election. On appeal, however, the Supreme Court, in evaluating our decision, stated that *McConnell* had *not* foreclosed as-applied challenges to the constitutionality of the electioneering communications definition and, accordingly, remanded the case back to us for consideration of the merits of WRTL's claims. In doing so, the Supreme Court, in essence, acknowledged the possibility that certain ads (i.e., "genuine issue ads"), that are neither express advocacy nor its functional equivalent, could be unconstitutionally captured by BCRA's electioneering communications definition. Plaintiff, not surprisingly, contends that these ads fall into that category.

To determine whether plaintiff is correct, this Court must engage in a two-step analysis of the ads in question. First, it must evaluate whether any or all of the ads constitute

15

either express advocacy or its functional equivalent. If they do, of course, that would be the end of the challenge because the Supreme Court in *McConnell* upheld BCRA's authority to regulate them. If they are not, however, this Court must then move on to determine whether the Government has demonstrated the necessary compelling state interest to regulate genuine issue ads during the 30- and 60-day periods leading up to the federal primary and general elections.

Defendants contend that all three ads are sham issue ads and are therefore regulable under the Supreme Court's majority holding in *McConnell*. The keystone to the defendants' analysis is their contention that the determination of whether an ad is a sham issue ad should not be limited to a facial evaluation of the ad's language and images, but a contextual analysis of the "intent" behind the ad's creation and the "effect" that the ad is intended, and likely, to have on the voting public. Plaintiff disagrees strongly. It contends that the judicial assessment of the ads should be limited to a facial evaluation of the ads' language and images. Determining intent and the likely effect of an ad on the viewing public is, to plaintiff's way of thinking, too conjectural and wholly impractical if future as-applied challenges are going to be evaluated on an emergency basis by three-judge panels prior to and during the BCRA blackout period leading up to federal primary and general elections. We agree.

The three ads in this case all deal with the public policy issue of filibustering the President's judicial candidates in the Senate. On their face, they set forth WRTL's position

16

against this practice and conclude with the all-too-familiar "call-to-action line" exhorting viewers/listeners, who presumably agree with WRTL's position, to contact Wisconsin's two United States Senators, Kohl and Feingold, and inform them of their opposition. The ads do not comment on either Senator's past or current position regarding this practice. Indeed, to the untutored viewer's eye, the ads, on their face, neither reveal either Senator's thinking on the issue, nor reference Senator Feingold's upcoming election contest. Therefore, plaintiff contends that these ads are a textbook example of genuine issue ads that are neither express advocacy nor its functional equivalent.

Defendants nonetheless contend that it is legally insufficient to limit an analysis of the ads to the face of the ads themselves and their objectively discernable components. They fear that doing so would ultimately result in the airing of too many issue ads that were *actually* "intended" to affect an election. Of course, to discern whether the sponsoring organization of these issue ads had the primary, or even ancillary, subjective intention to affect the election of the named candidate, the FEC would, by necessity, have to depose, at a minimum, the "decision maker(s)" of the organization in advance of the advertisements' airing. Moreover, to determine whether a particular ad that was intended to affect the election actually was likely to do so, would additionally require the retention of expert witnesses, on both sides, to speculate as to such. Common sense, if nothing else, dictates that requiring such prerequisites to assessing whether a given ad is a "sham ad" and therefore regulable under BCRA's electioneering communications definition is both practically and theoretically

unacceptable.

It is practically unacceptable because as-applied challenges, to be effective, must be conducted during the expedited circumstances of the closing days of a campaign when litigating contextual framework issues and expert testimony analysis is simply not workable. More importantly, however, is the fact that it is theoretically unacceptable because it proceeds on the highly questionable assumptions that: (1) any subjective intent to affect the election, regardless of its degree of importance, should negate an otherwise genuine issue ad; and (2) the speculative conjecture of experts can *actually* project the "likely" impact of a given ad on the electoral process. Neither the Supreme Court, nor any other Court, has recognized the validity of either assumption, and we do not find sufficient evidence here to bless either.[16] To the contrary, as recognized by the Supreme Court, delving into a speaker's subjective intent is both dangerous and undesirable when First Amendment freedoms are at stake. Indeed, in *Buckley v. Valeo*, 424 U.S. 1 (1976), the Supreme Court itself recognized

---

[16]     While, as our colleague's dissent recognizes, the Supreme Court's *McConnell* opinion may have alluded to the purpose and effect for which ads were run in analyzing whether section 203's definition of "electioneering communication" was facially constitutional, the Court's reasoning was not based upon an analysis of the subjective intent of either the parties airing the advertisements or the listeners hearing them. Rather, it was based largely upon an assessment of the generic past practices of certain media experts in designing sham issue ads that would affect elections, but not include the so-called "magic words" prohibited by *Buckley. See McConnell*, 540 U.S. at 193. Even those experts had to concede, however, that there are such things as genuine issue ads that the definition in section 203 would capture some of the time. *See, e.g., McConnell*, 251 F. Supp. 2d at 794-95 (Leon, J.). The as-applied challenge here, by contrast, puts squarely before a court for the first time the issue of whether three particular ads are genuine issue ads, thereby forcing this Court to decide whether to limit its assessment of the purpose and effect of those ads to the information contained within the ads' four corners. Thus, since the *McConnell* Court was spared such a choice in dealing with the facial challenge it confronted, its references to purpose and effect are of limited significance in this matter today.

that a test distinguishing between a discussion of issues and a discussion of candidates should not be based on a listener's determination of the speaker's subjective intent. The *Buckley* Court cited its prior decision in *Thomas v. Collins*, 323 U.S. 516, 535 (1945), with approval:

> [W]hether words intended and designed to fall short of invitation would miss that mark is a question both of intent and of effect. No speaker, in such circumstances, safely could assume that anything he might say upon the general subject would not be understood by some as an invitation. In short, the supposedly clear-cut distinction between discussion, laudation, general advocacy, and solicitation puts the speaker in these circumstances wholly at the mercy of the varied understanding of his hearers and consequently of whatever inference may be drawn as to his intent and meaning.
>
> Such a distinction offers no security for free discussion. In these conditions it blankets with uncertainty whatever may be said. It compels the speaker to hedge and trim.

*Id.* at 43.[17]

The uncertainty originally identified in *Thomas* is magnified, or course, in the context of election-related speech where any reference to a candidate, who is an office holder, can be interpreted—or misinterpreted—as campaign-motivated, as opposed to public policy-motivated. Thus, a system such as that encouraged by defendants where federal judges would be charged with conjuring the subjective intent of the speaker to affect the election

---

[17]     It is this language that led the Supreme Court to develop a "saving construction"—later termed the "magic-words test"—for old FECA § 608(e)(1), which provided that "[n]o person may make any expenditure . . . *relative to* a clearly identified candidate during a calendar year which, when added to all other expenditures made by such person during the year advocating the election or defeat of such candidate, exceeds $1,000." Noting that FECA contained no definition clarifying what expenditures are "relative to" a candidate, the Supreme Court found that it was unconstitutionally vague. *Buckley*, 424 U.S. at 41-42.

would fly in the face of decades of First Amendment jurisprudence and undoubtedly chill those exercising their free speech rights. Simply stated, it appears to this Court that the judiciary, in conducting First Amendment analysis, should not be in the business of trying to read any speaker's mind. Such an inquiry is unprecedented and not properly a part of any First Amendment analysis.

Accordingly, in evaluating whether WRTL's 2004 anti-filibuster ads are express advocacy or its functional equivalent, this Court will limit its consideration to language within the four corners of the anti-filibuster ads that, at a minimum: (1) describes a legislative issue that is either currently the subject of legislative scrutiny or likely to be the subject of such scrutiny in the near future; (2) refers to the prior voting record or current position of the named candidate on the issue described; (3) exhorts the listener to do anything other than contact the candidate about the described issue; (4) promotes, attacks, supports, or opposes the named candidate; and (5) refers to the upcoming election, candidacy, and/or political party of the candidate. In addition, as to the televised ad, the Court will also look to the images displayed in concert with the language to evaluate whether they otherwise accomplish the prohibited result.[18]

---

[18] Our colleague notes in his dissent a particular website reference that is included in the credits at the end of all three of the advertisements at issue. According to defendants, the website itself contained language that either opposed or attacked Senator Feingold and is therefore cited as proof that WRTL's intention in running the radio and television advertisements was to negatively influence Senator Feingold's electoral chances. Considering that BCRA regulates neither references to, nor the content of, advocacy-based websites, this Court believes that, unless and until Congress decides to amend BCRA to include such a regulation, WRTL's references to its website have no bearing on this Court's constitutional analysis.

20

In this case, the language in WRTL's advertisements does not mention an election, a candidacy, or a political party, nor do they comment on a candidate's character, actions, or fitness for office. Nevertheless, they do describe an issue that had been, and was likely to be, an ongoing issue of legislative concern in the Senate. Further, while the advertisements state that "[a] group of Senators" is filibustering federal judicial nominees, the ads do not state that either Senator Feingold or Senator Kohl are members of that group, and none of the images displayed in WRTL's television advertisement suggest as much. In fact, the only reference to Senator Feingold is in the closing line of the advertisements, or "call-to-action line," asking the listener to contact *both* Senator Feingold and Senator Kohl to ask them to oppose judicial filibusters.[19] The ads do not promote, attack, support, or oppose either Senator, nor do they even reference in any way the Senators' past voting records, current positions, or previous public statements on the judicial filibuster issue. Thus, on the face of these ads, there is simply no way of telling whether either Senator had previously supported or opposed the filibuster or whether the Senators had split on the issue. Finally, it is

---

[19]     As a member of the three-judge District Court in *McConnell*, Judge Leon concluded that "[t]he mere fact that these issue advertisements mention the name of a candidate (i.e., the elected representative in whose district the advertisement ran) does not necessarily indicate, let alone prove, that the advertisement is designed for electioneering purposes." 251 F. Supp. 2d at 794. In support of this conclusion, he cited to several of the plaintiffs' witnesses in that case. For example, Paul Huard of the National Association of Manufacturers ("NAM") testified that the name of a particular Member of Congress generally must be mentioned "if the purpose of the ad may be to induce viewers to contact the Member and communicate a policy position." *Id.* (citation omitted). Similarly, Denise Mitchell, Special Assistant for Public Affairs to the AFL-CIO, concurred, explaining that it is often necessary to refer to a federal candidate by name because "[t]he express or implied urging of viewers or listeners to contact the policymaker regarding [an] issue is . . . especially effective by showing them how they can personally impact the issue debate in question." *Id.* (citations omitted; alterations in original).

21

important to note that the advertisements treat Senators Feingold and Kohl equally, even though Senator Kohl was not a candidate for federal office in 2004. Oddly enough, had WRTL wished to run these ads mentioning only Senator Kohl, and ignoring Wisconsin's other United States Senator, it could have done so without offending BCRA section 203.

Accordingly, for all of the above reasons, the Court finds that, on their face, WRTL's three 2004 anti-filibuster advertisements were not "intended to influence the voters' decisions," and thus, the Court need not analyze whether the ads *in fact* would have—or potentially could have—affected Senator Feingold's reelection. For even if the Court were to assume that WRTL's anti-filibuster ads "were likely to have had an effect on the Senate Election had they run during the electioneering communications period"[20] (Def.'s Opp'n to Mot. Summ. J. at 9), reliance on effect, without the requisite intent, would be the equivalent of permitting listeners' subjective impressions to justify the regulation of protected speech. This is precisely the type of analysis that *Buckley* and *Thomas* said should be avoided.

Thus, the Court concludes that WRTL's 2004 anti-filibuster ads are not the functional equivalent of express advocacy, and the Court must now turn to an evaluation of whether the Government has demonstrated the compelling state interest necessary to justify the degree to which BCRA section 203 burdens WRTL's First Amendment rights.

---

[20]    See our Circuit Court's discussion in its underlying opinion in *Buckley v. Valeo*, 519 F.2d 821, 875 (D.C. Cir. 1975), which recognized that: "Public discussion of public issues which also are campaign issues readily and often unavoidably draws in candidates and their positions, their voting records and other official conduct. Discussion of those issues, and as well more positive efforts to influence public opinion on them, tend naturally and inexorably to exert some influence on voting at elections."

## II. *Strict Scrutiny Analysis*

In *McConnell*, the Supreme Court "easily" concluded, based on its prior decisions regarding campaign finance regulation, that there are compelling state interests that justify the regulation of express advocacy and its functional equivalent during the 30- and 60-day periods leading up to federal primary and general elections, respectively. 540 U.S. at 205. In particular, the Court pointed to its prior decisions in *Buckley* and *Bellotti*, where it spelled out the "unusually important interests [that] underlie the regulation of corporations' campaign-related speech," *id.* at 206 n.88, such as: preventing corruption, preserving the integrity of the electoral process, and preserving the public's confidence in its government, *id.* (citing *Bellotti*, 435 U.S. at 788-89).

The plaintiffs who prosecuted the facial challenge in *McConnell*, however, did not contest the Government's "compelling interest in regulating advertisements that expressly advocate the election or defeat of a candidate for federal office." *Id.* at 205. "Nor d[id] they contend that the speech involved in so-called issue advocacy is any more core political speech than are words of express advocacy." *Id.* Instead, they limited their attack to overbreath, claiming that "the justifications that adequately support the regulation of express advocacy do not apply to significant quantities of speech encompassed by the definition of electioneering communications," i.e., genuine issue ads that otherwise meet the requirements of BCRA section 203. *Id.* at 206.

The Supreme Court disagreed. It concluded that the justifications for the regulation

of express advocacy (i.e., the compelling government interests) equally apply to issue ads

aired during the proscribed statutory period "*if* the ads are intended to influence the voters'

decisions and have that effect." *Id.* at 206 (emphasis added). Indeed, it characterized such

issue ads as the "functional equivalent" of express advocacy. *Id.* Thus, even "assum[ing]

that the interests that justify the regulation of campaign speech might not apply to the

regulation of genuine issue ads," *id.* at 206 n.88, the Supreme Court nonetheless held that

BCRA section 203's application to genuine issue ads was not substantial enough to strike

down this section of the statute as facially unconstitutional.[21]  By permitting as applied

challenges to section 203's constitutionality, however, the Supreme Court has now put in

play the question it left open in *McConnell* as to whether the government interests that justify

regulating express advocacy and its functional equivalent also apply to the regulation of

genuine issue ads.  For the following reasons, this Court holds that they do not.

The common denominator between express advocacy and its functional equivalent,

as the Supreme Court defined it in *McConnell*, is the link between the words and images used

---

[21]      In performing its substantial overbreadth analysis, the Supreme Court was willing to "assume[] that BCRA will inhibit some constitutionally protected corporate and union speech," but nevertheless concluded that "[such an] assumption would not 'justify prohibiting all enforcement' of the law unless its application to protected speech is substantial, 'not only in an absolute sense, but also relative to the scope of the law's plainly legitimate applications.'" *McConnell*, 540 U.S. at 207 (quoting *Virginia v. Hicks*, 539 U.S. 113, 120 (2003)).  Without determining the "precise percentage of issue ads that clearly identified a candidate and were aired during those relatively brief preelection timespans but had no electioneering purpose," *Id.* at 206, the Supreme Court concluded that "the vast majority of ads clearly had such a purpose," *Id.*  In the final analysis, the Supreme Court held that plaintiffs failed to "carry their heavy burden of proving that amended FECA § 316(b)(2) is overbroad" because "[f]ar from establishing that BCRA's application to pure issue ads is substantial, either in an absolute sense or relative to its application to election-related advertising, the record strongly supports the contrary conclusion." *Id.* at 207.

in the ad and the fitness, or lack thereof, of the candidate for public office.[22] Indeed, it is that very link which evinces, on the face of the ad, the intent to influence the election that the *McConnell* Court imposed as a critical requirement to functional equivalency. Conversely, it is the absence of that link that enables an issue ad to be fairly regarded as a genuine issue ad. More importantly, it is the absence of that link which obviates the likelihood of political corruption and public cynicism in government where the ad, on its face, is devoid of any language the purpose of which is advocacy either for or against a particular candidate for federal office. Thus, while it may be theoretically possible to craft a genuine issue ad so subtly that it subconsciously encourages (or discourages) a potential voter to support a political candidate, there is no evidentiary or common sense basis to believe that such facially neutral ads are *necessarily* intended to affect an election, or will *necessarily* be viewed as such. Accordingly, in the absence of the Government demonstrating some other compelling interest to regulate genuine issue ads during the 30- and 60-day periods leading up to the federal primary and general election, the Court holds that Section 201's definition[23] as applied through section 203 to WRTL's 2004 antifilibustering issue ads is unconstitutional.

Turning to the Government's alternative bases for regulating genuine issue ads, the only other interest that the Government puts forward to justify BCRA section 203's regulation of WRTL's 2004 anti-filibuster advertisements is the interest in preserving section

---

[22]    *See McConnell*, 251 F. Supp. 2d at 796 (Leon, J.) ("It is the absence of a link between the advocacy of an issue and a candidate's fitness, or lack thereof, for election that renders congressional intervention with respect to genuine issue ads . . . unconstitutional.").

[23]    *See supra* note 7.

201's "bright-line" rule. Yet the virtues of the bright-line rule surely cannot alone justify regulating constitutionally protected speech. The Supreme Court itself has already held that the "desire for a bright-line rule . . . hardly constitutes the *compelling* state interest necessary to justify any infringement on First Amendment freedom." *FEC v. Massachusetts Citizens for Life, Inc.*, 479 U.S. 238, 263 (1986) (emphasis in original). And its remand of our earlier decision to permit this as-applied challenge is a tacit acknowledgment that, notwithstanding the virtues of a bright-line test, there may nonetheless be some ads that are unconstitutionally captured by BCRA section 203.    Thus, having concluded that WRTL's three 2004 anti-filibuster ads are such advertisements, we are hard-pressed indeed to conclude that preserving section 201's bright-line rule is a sufficiently compelling interest to warrant the ongoing regulation of these ads under BCRA.[24]

## CONCLUSION

For the foregoing reasons, the Court finds that (1) WRTL's 2004 anti-filibuster ads are neither express advocacy nor its functional equivalent; and (2) the Government has not articulated a sufficiently compelling interest to justify the burden that BCRA section 203 places on WRTL's First Amendment rights.    Accordingly, the Court GRANTS plaintiff's Motion for Summary Judgment as it applies to the three broadcast advertisements WRTL

---

[24]    Because we conclude that the Government has failed to demonstrate a compelling state interest in regulating WRTL's 2004 anti-filibuster ads, we need not address whether WRTL could/should have pursued other options for the financing of its advertisements or altered the content of its ads so as to avoid BCRA section 203's regulation altogether.

intended to run in 2004 and DENIES defendants' cross-motions.  An appropriate Order will

issue with this Memorandum Opinion.


12/21/06
Date

DAVID B. SENTELLE
United States Circuit Judge


12/21/06
Date

RICHARD J. LEON
United States District Judge

27

ROBERTS, District Judge, dissenting:

The majority employs a plain facial analysis of the text in WRTL's 2004 advertisements — ignoring the context in which the text was developed — to assess whether the ads are genuine issue ads which should escape BCRA's reach, or are regulable electioneering communications.   This approach is inconsistent with *McConnell,* is inconsistent with this panel's own prior rulings, and finds little support in logic.  Because a contextual analysis is warranted and discloses deep factual rifts between the parties concerning the purpose and intended effects of the ads, neither side is entitled to judgment as a matter of law, and I respectfully dissent from the majority's decision granting summary judgment to WRTL.

## DISCUSSION

WRTL, the FEC and the intervenors have moved for summary judgment.  Summary judgment may be granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56; *Shekoyan v. Sibley*, 409 F.3d 414, 422 (D.C. Cir. 2005).  Material facts are those "that might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248 (1986) (further holding that there is a genuine issue of material fact if the evidence is such that a reasonable jury could return a verdict for the non-moving party).  "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ."  *Id.* at 255.  In this case, in which parties

28

have filed cross-motions for summary judgment, this panel must determine whether either

party, as movant, has demonstrated that there is no dispute concerning the material facts that

must be assessed to determine the constitutionality of § 203's prohibition as applied to

WRTL's 2004 advertisements.

WRTL challenges § 203 as applied to its advertisements. "An as-applied challenge

. . . requires an analysis of the facts of a particular case to determine whether the application

of a statute, even one constitutional on its face, deprived the individual to whom it was

applied of a protected right." *Field Day, LLC v. County of Suffolk*, 463 F.3d 167, 174 (2d

Cir. 2006). WRTL argues that its ads are grassroots lobbying which should be exempt from

BCRA's regulations because it is not electioneering communication. (Mem. in Supp. of Pl.'s

Mot. Summ. J. ("Pl's Mot. Summ. J.") at 38.) WRTL asserts that even if this panel does not

recognize a grassroots lobbying exemption,[1] its ads are genuine issue ads which are not the

---

[1]       Because one of the "cardinal rules governing federal courts . . . [is] never to
formulate a rule of constitutional law broader than is required by the precise facts to which it is to
be applied," *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 501 (1985), there is no need to
address the issue of whether a grassroots lobbying exemption should be carved out. In 2006, the
Supreme Court remanded this case to this three-judge panel with the instruction that this panel
"consider the merits of WRTL's as-applied challenge in the first instance." *Wis. Right to Life v.
Fed. Election Comm'n*, 126 S. Ct. 1016, 1018 (2006). The remand did not order this panel to
adopt a definition of advertising that could be considered grassroots lobbying or genuine issue
advocacy, definitions never offered by the Supreme Court. Instead, this panel was expected to
use *McConnell*'s holding that § 203 was not facially unconstitutional and determine if WRTL's
ads should, nonetheless, not be regulated by BCRA. The responsibility of this panel is to
determine if WRTL's 2004 ads, which do not purport to be express advocacy, can still be
constitutionally regulated, not to identify the contours of advertising that is grassroots lobbying
or genuine issue advocacy. *See Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 665
(5th Cir. 2006) ("*McConnell* states only that a campaign finance regulation can cover issue
advocacy and nevertheless be constitutional so long as the regulation is 'closely drawn' to match
a 'sufficiently important' government interest . . . and is not vague." (internal citations omitted)).

functional equivalents of regulable express advocacy. Because the Supreme Court acknowledged that "the interests that justify the regulation of campaign speech might not apply to the regulation of genuine issue ads," *McConnell*, 540 U.S at 206 n.88, WRTL maintains that as applied to its ads, § 203 is unconstitutional.[2]

The FEC and the intervenors argue that WRTL's ads are electioneering communications that are properly regulable under BCRA, and that a grassroots lobbying exemption would threaten the Supreme Court's ruling in *McConnell*. (Def.'s Mem. in Supp. of Mot. Summ. J. ("Def.'s Mot. Summ. J.") at 1, 21, 26.) They claim that the ads were intended to influence the votes in the 2004 Senate election and fit the very type of activity that *McConnell* found Congress had a compelling interest in regulating. The defendants also assert that the ads were designed and timed to set up a legal challenge to the BCRA and thus were not genuine issue ads entitled to be funded by corporate funds.

## I. *McConnell*

*McConnell* upheld the validity of the electioneering communication definition in § 203 of BCRA over a First Amendment challenge. Noting that "[g]overnment has a compelling interest in regulating advertisements that expressly advocate for the election or

---

[2]      WRTL suggests that the remand in this case makes clear that the Supreme Court has permitted as-applied challenges "regarding communications that necessarily fall within the prohibition periods or there would [be] no as-applied challenges at all." (Pl.'s Opp'n to Def.'s Mot. to Compel at 5.) The Supreme Court did not state that there had to exist an as-applied challenge that would succeed; it merely held that "in upholding § 203 against a facial challenge, [it] did not purport to resolve future as-applied challenges." *Wis. Right to Life*, 126 S. Ct. at 1018.

defeat of a candidate for federal office," *McConnell*, 540 U.S. at 205, the *McConnell* Court

cited numerous values relating to this interest, including "'[p]reserving the integrity of the

electoral process, preventing corruption, and sustaining the active, alert responsibility of the

individual citizen in a democracy for the wise conduct of government.'" *Id.* at 206 n.88

(quoting *First Nat'l Bank v. Bellotti*, 435 U.S. at 788-89). Although the Court recognized

the existence of genuine issue ads, it nevertheless held that some issue advertisements could

fall within the category of electioneering communications to be regulated by BCRA.[3]

*McConnell*, 540 U.S. at 206. Using the Bill Yellowtail advertisement as an example, the

Court explained that "although. . . . advertisements [may] not urge the viewer to vote for or

against a candidate in so many words, they are no less clearly intended to influence the

election." *Id.* at 193.[4]  *McConnell* held that § 201's electioneering communication was

narrowly tailored to meet a compelling government interest. In its constitutional analysis of

§ 203, the Court described viable alternatives for organizations seeking to broadcast "genuine

---

[3]      The Court found little difference "between an ad that urged viewers to 'vote
against Jane Doe' and one that condemned Jane Doe's record on a particular issue before
exhorting viewers to 'call Jane Doe and tell her what you think.'" *McConnell*, 540 U.S. at 126-
27.

[4]      A group called "Citizens for Reform" sponsored an advertisement during the 1996
Montana congressional race in which Bill Yellowtail was a candidate. The advertisement stated:
"'Who is Bill Yellowtail? He preaches family values but took a swing at his wife. And
Yellowtail's response? He only slapped her. But her "nose was not broken." He talks law and
order . . . but is himself a convicted felon. And though he talks about protecting children,
Yellowtail failed to make his own child support payments — then voted against child support
enforcement. Call Bill Yellowtail. Tell him to support family values.'" *McConnell*, 540 U.S. at
194 n.78 (internal citation omitted). The Court said that "[t]he notion that this advertisement was
designed purely to discuss the issue of family values strains credulity." *Id.*

31

issue advertising" without running afoul of the electioneering communication provision: "corporations and unions may finance genuine issue ads . . . [during prohibited periods] by simply avoiding any specific reference to federal candidates, or in doubtful cases by paying for the ad from a segregated fund." *Id.* at 206.

## II. *Facial Analysis*

The landscape of campaign finance law has been changed by BCRA and *McConnell*. There is no longer a bright line rule for distinguishing between express advocacy and genuine issue advocacy to determine which may be constitutionally regulated. Courts can no longer rely on *Buckley v. Valeo*'s magic words test to determine whether the advertising at issue is electoral advocacy, namely whether certain election-related words are present or absent. *Id.*, 424 U.S. at 43-44 & 44 n.52. Before *McConnell*, some judicial sentiment disfavored examining the context rather than the literal text of election ads.[5] For example, *North Carolina Right to Life, Inc. v. Leake*, 344 F.3d 418 (4th Cir. 2003), held unconstitutional a provision of a North Carolina campaign reform statute that allowed a contextual examination of an advertisement to determine its status as express advocacy. "This circuit . . . has consistently interpreted *Buckley* as allowing regulation 'only if it [is] limited to expenditures for communications that literally include *words which in and of themselves* advocate the

---

[5] That sentiment was not unanimous. *See Federal Election Comm'n v. Furgatch*, 807 F.2d 857, 863-64 (9th Cir. 1987) (holding that in the realm of express advocacy, although context is a limited concern especially when assessing the impact of the speech itself, it nonetheless "is relevant to a determination of express advocacy. A consideration of the context in which speech is uttered may . . . supply necessary premises that are unexpressed but widely understood by readers or viewers.").

election or defeat of a candidate.'" *Id.* at 425 (internal citations omitted). There is no doubt, though, that *McConnell* has unsettled those sentiments. *Leake* was vacated and remanded by the Supreme Court in light of its *McConnell* decision. *Leake v. North Carolina Right to Life, Inc.*, 541 U.S. 1007 (2004).

That *Leake* was vacated comes as no surprise. The *McConnell* Court assessed the subjective intention of the advertising before it in deciding that § 201 was not overly broad. The Court evaluated ads which their proponents claimed were genuine issue advertising with no electioneering purpose and nevertheless concluded that although an advertisement may not plainly promote or attack a candidate, it may still be "clearly *intended* to influence the election." *McConnell*, 540 U.S. at 193 (emphasis added) (further stating that "[f]ar from establishing that BCRA's application to pure issue ads is substantial, either in an absolute sense or relative to its application to election-related advertising, the record strongly supports the contrary conclusion."). In discussing the record, the *McConnell* Court specifically examined both the purpose of the ads before it as well as their impact on the relevant election. "The precise percentage of issue ads that clearly identified a candidate and were aired during those relatively brief pre-election timespans but had no electioneering purpose is a matter of dispute between the parties and among the judges on the District Court . . . . Nevertheless, the vast majority of ads clearly had such a *purpose*." *Id.* at 206 (emphasis added) (further stating that "justifications for the regulation of express advocacy apply

equally to ads aired during those periods if the ads are *intended* to influence the voters' decisions and have that *effect*." (emphases added)).

The majority does not believe that this panel should engage in a contextual analysis, claiming that such an inquiry is foreclosed by the Supreme Court's holdings in *Buckley* and *Thomas*. My colleagues quote language in *Thomas* to suggest that an intent- and effect-based inquiry into whether or not an advertisement is express advocacy will create ambiguity and uncertainty on the part of the speaker. They suggest that a facial analysis of whether the advertisement, among other things, promotes or attacks the named candidate, is appropriate and that any other course of action is impractical and undesirable. However, the *McConnell* Court looked precisely to the purpose and effect of advertising in a facial challenge to the constitutionality of the electioneering communication provision, and there is no logical reason why this panel should not engage in such an analysis for an as-applied challenge. *See Alaska Right to Life Comm. v. Miles*, 441 F.3d 773, 785-86 (9th Cir. 2006) (citing *McConnell* for the proposition that an advertisement's effect matters in both a facial and an as-applied challenge for overbreadth to an Alaska campaign finance law). A purpose- and effect-based inquiry seems necessary to determine if WRTL's ads are genuine issue ads or are instead express or sham issue advocacy because the "presence or absence of magic words cannot meaningfully distinguish electioneering speech from a true issue ad." *McConnell*, 540 U.S. at 193.

34

The majority also appears to blur the Supreme Court's prohibition on employing a test that involves the subjective intent of the *listener* and one that involves the subjective intent of the *advertiser*. *See McConnell v. Fed. Election Comm'n*, 251 F. Supp. 2d at 568 (opinion of Kollar-Kotelly, J.) ("[T]he Supreme Court made clear that a test distinguishing between a discussion of the issues and a discussion of candidates that relied on the subjective intent of the listener was problematic."). In *Thomas*, the Court criticized a test based upon an "understanding of the hearers," but drew no conclusion about whether the speaker's purpose could be used to examine the nature of the speech. The majority cites no precedent holding that there may be no inquiry into the subjective intent of the speaker in determining the type of speech made.[6]

---

[6]     Indeed, criminal statutes enacted by Congress punish conduct or speech based upon a prohibited intent or purpose of the speaker. *See, e.g.*, 18 U.S.C. §§ 245(b)(1),(4), 248(a)(1), 42 U.S.C. § 3631(b),(c) (threat with the purpose of intimidating someone from engaging in protected activities); 18 U.S.C. § 288 (false statement for purpose of obtaining payment on false postal indemnity claim); 18 U.S.C. §§ 875(b),(d), 876(b),(d), 877 (threat to injure with intent to extort); 18 U.S.C. § 1033(a)(1) (false statement with intent to deceive insurance regulator); 18 U.S.C. § 1583 (persuading another to go to another place with intent to make him a slave); 18 U.S.C. § 1860 (verbal intimidation for the purpose of hindering land purchase). Among them are statutes that have survived First Amendment challenges. *See, e.g.*, *United States v. Dinwiddie*, 76 F.3d 913, 922, 925 (8th Cir. 1996) (18 U.S.C. § 248, stating that a court "must analyze an alleged threat in light of its entire factual context" (internal citation omitted)); *accord Terry v. Reno*, 101 F.3d 1412, 1418 (D.C. Cir. 1996); *United States v. Gregg*, 226 F.3d 253, 267 (3d Cir. 2000) (collecting cases upholding 18 U.S.C. § 248 against a First Amendment challenge); *United States v. Hutson*, 843 F.2d 1232, 1235 (9th Cir. 1988)(18 U.S.C. § 876); *United States v. Cassel*, 408 F.3d 622, 634-35 (9th Cir. 2005) (18 U.S.C. § 1860). *Cf. Virginia v. Black*, 538 U.S. 343, 363 (2003) (noting that "[t]he First Amendment permits Virginia to outlaw cross burnings done with the intent to intimidate because burning a cross is a particularly virulent form of intimidation").

In ignoring the context in which the advertisements were developed, the majority also takes a sharp turn from its own prior rulings.  Two years ago, this panel unanimously found that WRTL had failed to establish a likelihood of success on the merits and denied its motion for injunctive relief, stating that "[t]he facts suggest that WRTL's advertisements may fit the very type of activity *McConnell* found Congress had a compelling interest in regulating." *Wis. Right to Life v. Fed. Election Comm'n*, Civil Action No. 04-1260, 2004 WL 3622736, at *3 (D.D.C. Aug. 17, 2004).  We explicitly found and cited contextual facts as relevant to our conclusion discounting the likelihood of finding any constitutional infirmity in BCRA's regulation of the WRTL advertisements.[7]

After the remand from the Supreme Court, this panel more than once took a clear position favoring contextual analysis when the parties voiced sharp disagreement over what if any discovery would be relevant to the merits of WRTL's complaint.  The FEC and the intervenors proposed a briefing schedule that contemplated conducting discovery into a variety of issues regarding the purpose and effect of WRTL's 2004 advertisements.  (Def.'s Opp'n to Pl.'s Mot. to Reinstate, Order Supp. Briefing, and Expedite Cross-Mots. Summ. J. at 3-4; Def.'s Mem. in Support of Rule 16 Proposal for Disc. and Summ. J. at 3; Intervenors'

---

[7]         We found that Senator Feingold's opponents used as a campaign issue over a year before the election his support of filibusters against judicial nominees; that WRTL's PAC endorsed in March 2004 three candidates opposing Senator Feingold and announced his defeat as a priority; and that WRTL criticized in a July 2004 news release Senator Feingold's record on Senate filibusters against judicial nominees. *Wis. Right to Life v. Fed. Election Comm'n*, Civil Action No. 04-1260, 2004 WL 3622736, at *1 (D.D.C. Aug. 17, 2004).  We did not depart from those findings on May 10, 2005, when we unanimously dismissed WRTL's case.

Mem. in Support of Def.'s Rule 16 Proposal for Disc. and Summ. J. at 1-2.) WRTL urged

that such discovery bearing on context was flatly irrelevant, and insisted that the

constitutional question turns solely upon the content of the communication itself, making

discovery unnecessary. (Pl.'s Reply Mem. in Supp. of Mot. to Reinstate, Order Supp.

Briefing, and Expedite Cross-Mots. for Summ. J. ("Pl's Reply Mem.") at 4, 8.) This panel

unanimously rejected WRTL's position and ordered a period of discovery "into the purpose

and effect of plaintiff's 2004 advertisements for the 2004 campaign[,]" among other topics.

(Scheduling Order of Apr. 17, 2006 at 2.) And when WRTL later resisted discovery into to

the purpose and effect of its 2004 advertisements (Def.'s and Intervenors' Mot. To Compel

Produc. of Docs., Reqs. to Admit, Resps. to Interrogs. ("Def.'s Mot. to Compel") at 1-2) as

irrelevant and arguing that the constitutionality of BCRA's application to speech depends

only upon the text rather than the context of the speech (Pl.'s Opp'n to Def.'s Mot. To

Compel Produc. of Docs., Reqs. to Admit, Resps. to Interrogs. at 5, 8), this panel

unanimously compelled WRTL to respond to all of the twenty-two discovery requests

propounded either fully or with minor modifications. (Def.'s Mot. to Compel at 5-6, 9-19,

21-22; Order, Aug. 18, 2006.)

Our repeated decisions requiring inquiry into the context in which the advertisements

were developed were right then, and they are right now. The majority now brushes them

aside and adopts the very approach that it squarely and repeatedly rejected. It partly justifies

using its facial analysis approach for reasons of judicial manageability, *supra* at 17-18, a

37

basis for decision that even the plaintiff rejects.  (Pl.'s Reply Mem. at 8 (stating that in selecting a proper analytical standard, "constitutional mandates clearly outweigh . . . judicial manageability").)

Any analysis of whether WRTL's ads are genuine issue ads should be achieved through assessing the ads' context and WRTL's purpose or intent in broadcasting the ads.

## CONTEXTUAL ANALYSIS

### I. *Express Advocacy*

WRTL claims that its ads are not express advocacy because they do not "expressly advocate for the election or defeat of a candidate for federal office." *McConnell*, 540 U.S. at 205.  WRTL instead maintains that its ads are grassroots lobbying that discusses legislative concerns.  Although WRTL acknowledges that its ads may have an impact on the outcome of federal elections, it claims that their primary purpose is to "focus on [a] legislative issue in question, not on any candidate" (Pl.'s Mot. Summ. J. at 10), and to "influenc[e] the votes of Senators Feingold and Kohl" before Congress adjourned.  (Am. Ver. Compl. ¶ 12.) However, a genuine issue of material fact exists as to whether WRTL intended its ads to expressly advocate for the defeat of Senator Feingold.

Although the ads at issue do not explicitly encourage their listeners or viewers to oppose Senator Feingold, they do state that "[a] group of Senators is using the filibuster delay tactic to block federal judicial nominees from a simple 'yes' or 'no' . . . .  Contact Senators Feingold and Kohl and tell them to oppose the filibuster."  (Ver. Compl., Ex. A.)  The

structure of the ads further suggests that Senator Feingold might be one of the "group of Senators . . . causing gridlock and backing up some of our courts to the state of emergency." (*Id.*) Notably, the ads provide the listeners or viewers with no direct contact information for the Senators; instead, the ads direct the listeners or viewers to a website created by WRTL, www.befair.org, which featured e-alerts that "excoriat[ed]" Senator Feingold on the filibuster issue. (Def.'s Mot. Summ. J. at 29; Ex. 2 ¶ 21.) Thus, even a textual approach could suggest that if the ads were broadcast during BCRA's prohibited period, they might have implicitly discouraged Senator Feingold's re-election.

WRTL's role in the political environment that wrought the ad campaign in the first place could be probative of the intent of the ads. WRTL has opposed Senator Feingold since his election in 1992 and has used expenditures from its federal political action committee ("PAC") to support his political opponents. (*Id.*, Exs. 11, 12.) In 1998, WRTL spent more than $60,000 on independent expenditures to oppose Senator Feingold's reelection to a second term. (*Id.*, Ex. 11.) In 2004, Senator Feingold's reelection campaign coincided with the presidential election, and WRTL declared its "resolve to do everything possible to win Wisconsin for President Bush and to send Russ Feingold packing!" (*Id.*, Ex. 21.) WRTL made the defeat of Feingold "a priority." *Wis. Right to Life*, Civil Action No. 04-1260, 2004 WL 3622736, at *1. WRTL endorsed through its PAC three of Senator Feingold's main opponents. (*Id.*, Ex. 54.) WRTL spent $7,500 on political literature that both supported Senator Feingold's opponents and explicitly opposed Senator Feingold (Intervenors's Opp'n

to Pl.'s Mot. Summ. J. at 4-5), including a press release exhorting that "the defeat of Feingold must be uppermost in the minds of Wisconsin's right to life community in the 2004 elections." (*Id.*, Ex. 54.) WRTL's Executive Director Mary Lyons stated that the organization's "greatest challenge for 2004" was "to finish strongly in the elections," by "retir[ing] Senator Feingold." (*Id.*, Ex. 24 at 3.) The website referred to in the advertisements at issue, www.befair.org, explicitly attacked Feingold's record and encouraged website readers to defeat him. (*Id.*, Ex. 54.)

Senator Feingold's participation in judicial filibustering was a particular focus of criticism by WRTL, which distributed a voter guide endorsing one of Feingold's opponents who pledged to allow judicial nominees an up or down vote. (Def.'s Mot. Summ. J., Exs. 15 at 3, 24.) In the fall of 2004, WRTL's federal legislative director, Douglas Johnson, acknowledged that "it would certainly help if a few of the pro-abortion, pro-filibuster Democratic senators were replaced by pro-life Republicans, and that could happen." (Def.'s Mot. Summ. J., Ex. 24 at 5.) Senator Feingold's opponents also saw the filibuster issue as a key campaign issue. (*Id.*, Ex. 15 at 3-4.) One of Senator's Feingold's key opponents, Bob Welch, characterized Feingold's support of filibustering as partisan, calling "[t]he gridlock caused by Russ Feingold's partisanship . . . appalling . . . . Because of his obstructionism the wheels of justice are grinding to a halt." (*Id.*, Ex. 13.)

The reason for WRTL's shift to broadcast advertising and the import of its timing are in dispute. Through early 2004, WRTL used non-broadcast means to convey its criticism of

Senate filibusters of President Bush's judicial candidates. (Def.'s Mot. Summ. J., Ex. 3 at 62-63.) Although filibusters of judicial nominees had occurred before then, WRTL had not run any broadcast advertisements on the issue before then. (*Id.*, Ex. 3 at 82.) However, around May of 2004, WRTL began planning a series of advertisements in opposition to filibustering. (Pl.'s Mot. Summ. J. at 6.) WRTL claims its shift to broadcast ads was because they were "the most effective form of communication for the present grass-roots lobbying campaign[.]" (Am. Ver. Compl. ¶ 51.) WRTL began broadcasting its advertisements on July 26, 2004, but stopped running those advertisements on August 15, 2004 because it believed that on that date, its ads would become prohibited electioneering communications as to Senator Feingold. (*Id.* ¶¶ 12, 14, 52.) WRTL claims it expected that filibuster votes would occur during times in which electioneering communications were regulated under BCRA (*id.* ¶ 6), namely, after August 15, 2004. In fact, the advertisements began airing in July, days after the last of the judicial filibuster cloture votes had occurred during that session and the Senate had departed for a six-week recess. (Def. Mot. Summ. J., Def.'s Stmt. Mat. Facts ("Def.'s Stmt. Mat. Facts") ¶ 69; Def.'s Mot. Summ. J., Ex. 35.) WRTL did not run any additional anti-filibustering ads after the 2004 election (Def.'s Mot. Summ. J., Ex. 48 at 8-10) in either 2004 or in 2005 during the height of the controversy. (*Id.* at 8.) The FEC insists that WRTL's decision to begin an advertising campaign after the votes defeated the purpose of the campaign especially because "both WRTL's employee in charge of grass roots lobbying and its advertising agency lead consultant believe that it is important to run grassroots lobbying

41

advertising shortly *before* legislative votes are to occur." (*Id.* at 8; Ex. 4 at 112; Ex. 5 at 30-31.)

The FEC argues that WRTL's ads are neither grassroots lobbying nor genuine issue ads; instead, they are express advocacy meant to encourage constituents to oppose Senator Feingold. Because of the timing of the ads, the defendants assert that the ads were intended to have an effect on the election and would have had such an effect if WRTL had run them during BCRA's prohibited electioneering communication period. The FEC maintains that "because the ads portray Senator Feingold in a negative light and clearly would influence the outcome of the election for which he was campaigning . . . [they] would have been one of the many messages that created an impression about Senator Feingold in the weeks before the election that would have informed voters' decisions about the upcoming election." (*Id.* at 10.)

The intent of the advertising campaign is a genuine issue of material fact, and neither side persuasively argues that no dispute about intent exists. WRTL claims that its 2004 broadcast advertising was generated by its opposition to judicial filibustering. The FEC counters that the advertising was meant to oppose Senator Feingold and was timed to affect the election, not any filibuster votes. WRTL insists that the timing of the campaign was geared toward a "Fall Showdown" in November 2004 which did not occur. (Pl.'s Mot. Summ. J. at 4.) The timing issue alone requires that this case not be disposed of on summary judgment.

## II. *Sham Issue Ads*

The FEC argues that even if this panel does not find that WRTL's advertising was express advocacy, the advertising campaign was intended to spark a lawsuit challenging the BCRA, making it sham issue advocacy. WRTL instead states that its advertising was "bona fide" grassroots lobbying that "expressed an opinion on pending Senate legislative activity, which was imminently up for a vote, and urged listeners to contact their Senators and to urge them to vote a certain way in the upcoming vote." (*Id.* at 10.) A genuine issue of material fact exists as to whether the advertising was intended to challenge BCRA, which would make the advertising sham issue advocacy.

The FEC notes that although WRTL had previously engaged in a number of different issue campaigns in the past, the judicial filibustering campaign was "distinct from the other activities of e-mailing [WRTL's] supporters." (Def.'s Mot. Summ. J., Ex. 4 at 105.) The FEC contends that WRTL's Executive Director was aware of the restrictions imposed by BCRA and was "hopeful that she would be able to get an exception [from the court] and continue running those ads." (*Id.*, Ex. 5 at 42.) The FEC's evidence, uncontested by WRTL, could suggest that the potential for the lawsuit shaped how the advertising campaign was coordinated and conducted. Jason Vanderground, a brand consultant hired to work on the filibustering campaign testified in his deposition that the impending lawsuit was discussed among members of WRTL's advertising team and he did research regarding the minimum number of households an ad would have to reach in order to trigger the BCRA ban. *See* 2

U.S.C. § 434(f)(3)(C). He also researched the legal parameters of BCRA because he knew that "we were going to be creating advertising that would fall within what some of those laws addressed." (*Id.*, Ex. 5 at 47.) The contingency plan if this panel did not allow the ads to go forward was to "draw attention to the fact that the campaign was not allowed back on the air" by attacking the BCRA. (*Id.*, Ex. 5 at 84.) Vanderground also planned the advertising for a national market, which could make suspect WRTL's claim that the focus of its advertising was to encourage Wisconsin voters to call their Senators. The FEC argues that the actual goal was to spur a lawsuit that would have a national impact.

The parties also agree that language regarding the BCRA figured prominently, at least initially, in the judicial filibustering campaign. Vanderground proposed putting information on WRTL's *befair* website about both the judicial filibuster issue and "campaign finance reform." (*Id.*, Ex. 5 at 58.) Initial draft press releases primarily addressed the impact of the BCRA; Executive Director Lyons noted that one draft "is more about the BCRA than the filibuster." (*Id.*, Ex. 33 at 2.) This evidence fairly raises factual questions concerning the genesis of the ads as genuine issue ads.

The FEC asserts that WRTL chose to raise money for its general fund rather than its PAC. It argues that WRTL made a conscious decision not to possess in its PAC the requisite amount of funds needed for the advertising campaign. (Def.'s Stmt. Mat. Facts ¶¶ 112-21.) WRTL raised over $315,000 from corporations for its general fund in 2004. (Def.'s Mot. Summ. J. at 10.) Although WRTL's PAC raised approximately $155,000 in the 1999-2000

44

election cycle, it had $13,766.90 in its coffers in 2004. WRTL claims that raising PAC money

is difficult being "subject to source, amount, disclosure requirements, and donor resistance

to such contributions." (Pl.'s Mot. Summ. J. at 12.)   It also asserts that it could not have

raised the requisite PAC funds to pay for the advertising campaign (*id.*, Ex. 1 ¶¶ 8, 11) even

if it did not spend PAC money on other independent expenditures and contributions.

However, the FEC retorts that PAC receipts nationally increased approximately 50% during

the period between the 1999 and 2004 election cycles and "WRTL has provided no reason

why fundraising was harder for its PAC than everybody else." (Def.'s Mot. Summ. J. at 11;

Def.'s Stmt. Mat. Facts ¶ 117.) A permissible inference is that WRTL was unwilling to raise

funds for its PAC so it would be forced to fund electioneering communications through its

general fund and could create a challenge to the BCRA.

This evidence reveals a genuine dispute as to whether WRTL intended to use its

advertisements as a test case, rendering them "sham" issue advocacy.

## CONCLUSION

A genuine issue of material fact exists as to whether WRTL's 2004 advertisements

were intended to influence a Senate election, or to spark litigation, or to be genuine issue ads.

Because a resolution of that dispute is necessary — rather than a mere facial assessment of the

ads' text — to determine whether BCRA may properly regulate the ads, this case cannot be

resolved on cross-motions for summary judgment.  Therefore, I respectfully dissent from the

majority's grant of summary judgment to WRTL.

_12/21/06_
Date

_Richard W. Roberts_

RICHARD W. ROBERTS
United States District Judge